**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal Action No.: 4:05cr9** |
| | : | |
| **PAMELA YVETTE HOFFLER-RIDDICK,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## OPINION

After an eleven day trial, a jury convicted defendant Pamela Yvette Hoffler-Riddick of one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h), and four counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).  Defendant moved the Court pursuant to Fed. R. Crim. P. 29(c) to set aside the jury's verdict and enter a judgment of acquittal.  Because the United States failed to prove that the financial transactions at issue in Counts 40-43 of the Indictment were designed to conceal the source, ownership, or control of tainted funds, the Court entered a judgment of acquittal on the substantive money laundering charges.  However, the Court denied defendant's Rule 29 motion as it pertained to the conspiracy charge in Count 4.  The evidence introduced at trial, when viewed in the light most favorable to the prosecution, was sufficient to prove each and every element of the conspiracy offense.

At sentencing, the United States urged the Court to incarcerate the defendant for 188 to 235 months.  However, the Court rejected the United States attempt to attribute to defendant Hoffler-Riddick the large quantity of drugs that generated the money she

laundered, and instead imposed a Guideline sentence of 78 months. The Court also

denied defendant Hoffler-Riddick's Motion for an Appeal Bond because she did not

identify any ground for appeal "likely to result in (i) reversal; [or] (ii) an order for a new

trial." See 18 U.S.C. § 3143(b)(1)(B).

This Opinion explains the Court's rulings.

## STATEMENT OF FACTS

Defendant Hoffler-Riddick is a highly accomplished educator who was awarded a

Ph.D. from Virginia Tech. From 1994 until February 2000, she was employed by the

City of Norfolk, Virginia Public Schools as a teacher, principal, and administrator. In

1996, defendant began a romantic relationship with co-defendant John Cecil McBride.

McBride was a financial advisor with the prominent brokerage firm of Wheat First

Securities (now known as Wachovia Securities).

In 1998, McBride began conducting business with a major drug dealer in

Richmond, Virginia named Aaron Burton. McBride testified at trial that when he first

met Burton, he understood Burton to be a former drug dealer who now had a legitimate

business. Unbeknownst to McBride at the time, Burton was still dealing drugs. Burton

asked McBride to help him invest the profits he earned from this supposedly legitimate

business. McBride soon began assisting Burton with all of his financial needs.

One of the services McBride provided to Burton was help in purchasing a

vehicle. Burton's credit was so poor that no financial institution would loan him the

money to make such a purchase. To circumvent this problem, McBride began

searching for a nominee to obtain a loan and "own" the vehicle while Burton made the

payments. McBride testified that he solicited a number of business associates without

2

success.  He finally turned to his girlfriend, defendant Hoffler-Riddick.  She agreed to purchase a vehicle in her name so long as someone else paid the vehicle loan, and she did not have any responsibility for ongoing expenses such as insurance or personal property taxes.  Defendant Hoffler-Riddick also demanded, and McBride agreed, that the vehicle would remain in her name for only one year.

McBride testified that he did not know at the time of the vehicle purchase that Aaron Burton was still selling drugs or that his money was derived from drug dealing.  McBride further testified that defendant Hoffler-Riddick had no reason to believe that the funds used to purchase the vehicle represented the proceeds of illicit activity.  In addition, defendant Hoffler-Riddick did not request any compensation for acting as a nominee.  She agreed to McBride's request solely as a favor to her boyfriend.

On February 20, 1998, defendant Hoffler-Riddick purchased on behalf of Aaron Burton a 1998 Chrysler Town and Country van.  McBride completed and defendant Hoffler-Riddick signed a number of documents relating to the purchase, including loan and insurance applications, and a vehicle registration.  McBride paid for the van by taking $8,000 in cash from Burton and converting it into a cashier's check with which to make the down payment.  The balance of the purchase price, approximately $25,000, was financed in defendant Hoffler-Riddick's name through Chrysler Financial.  McBride made the monthly payments of $473.32 via checks drawn on his personal accounts.  Burton reimbursed McBride in cash for the payments.  Defendant Hoffler-Riddick forwarded to McBride the invoices and proof of insurance cards that she received in the mail.

The one-year period during which defendant Hoffler-Riddick would own the van

3

came and went.  A second year came and went.  Finally, in September 2000, defendant

Hoffler-Riddick demanded that McBride honor their agreement and pay off the Chrysler

Financial loan.  Defendant Hoffler-Riddick had relocated to Maryland to accept a high

profile administrative job in the Montgomery County Public Schools and needed to

qualify for a mortgage to purchase a new home.

To comply with defendant Hoffler-Riddick's demand, McBride obtained $16,650

in cash from Burton.  On September 28, 2000, McBride converted this cash into two

cashier's checks, which he forwarded to Chrysler Financial.  Although Chrysler

Financial timely released its lien, the van was not taken out of defendant Hoffler-

Riddick's name until February 2001.  The van was ultimately titled in the name of

Burton's sister, co-defendant Angela Clark.  Both the prosecution and defense agree

that someone forged defendant Hoffler-Riddick's signature on the title transfer.

The prosecution and defense also agree that defendant Hoffler-Riddick did not

know when she purchased the van that Burton's money represented proceeds of drug

distribution activities.  However, the evidence introduced at trial established that this veil

of ignorance had lifted by September 2000 when defendant Hoffler-Riddick demanded

that the loan be paid in full.  McBride testified that he informed defendant Hoffler-

Riddick on numerous occasions about the true source of Burton's money.  Indeed,

McBride claimed that in April 1999 defendant Hoffler-Riddick accepted his invitation to

take an afternoon drive with him from his home in Chesapeake, Virginia to New Kent

County, Virginia.  McBride carried in the car 3 kilograms of cocaine for delivery to

Burton.  According to McBride's uncorroborated testimony, defendant Hoffler-Riddick

examined the cocaine out of curiosity during their road trip.

4

Despite learning that Burton's money came from drug dealing, defendant Hoffler-Riddick continued to help McBride convert Burton's cash into other assets.  In May 1999, McBride agreed to help Burton use his drug money to purchase a house located at 329 Center Street in Hampton, Virginia.  In furtherance of this transaction, McBride gave defendant Hoffler-Riddick $10,000 in cash and instructed her to convert it into cashier's checks.  On May 20, 1999, defendant Hoffler-Riddick arranged for her goddaughter and subordinate employee, Patrice Jones, to use the cash to purchase two $5,000 cashier's checks from NationsBank (now Bank of America) in Norfolk.  However, the checks could not be used because they were made payable to a title company rather than to the attorney closing the transaction.  On May 24, 1999, acting on McBride's instructions to remedy the situation, defendant Hoffler-Riddick had Patrice Jones exchange the checks for new cashier's checks made payable to the proper party.  Using these and other laundered funds, Burton purchased 329 Center Street for $95,000.

During the 2 ½ years that Burton's van was titled in her name, defendant Hoffler-Riddick also personally accepted the benefits of Burton's drug money.  On May 31, 2000, McBride paid off two loans totaling $6,560 that defendant Hoffler-Riddick owed to the Norfolk School Employees Federal Credit Union.  McBride testified that he paid off the loans to reward defendant Hoffler-Riddick for having served as nominee owner of the van.

Even after the van loan was paid in full in September 2000, Defendant Hoffler-Riddick continued to help McBride launder Burton's drug money.  In November of that year, McBride traveled to defendant Hoffler-Riddick's new home in Rockville, Maryland.

5

According to McBride, he gave defendant Hoffler-Riddick $13,000 in cash with instructions to use the cash to purchase 26 money orders in the amount of $500 each. The following day, McBride gave defendant Hoffler-Riddick $7,000 in cash.  She deposited this cash into her personal account at MCT Federal Credit Union.  At McBride's direction, she immediately purchased a cashier's check in the same amount made payable to one of McBride's front companies.  McBride testified that he advised defendant Hoffler-Riddick that the cashier's check and money orders would be used to purchase another house for Aaron Burton.  On November 27, 2000, Burton used these and other laundered funds to purchase 323 East Pembroke Avenue in Hampton, Virginia for $114,900.

Although the Maryland cashier's check and the Maryland money orders were the last illicit funds that she laundered, defendant Hoffler-Riddick continued to associate with both McBride and Burton.  In late winter of 2003, Burton and a small time drug dealer named Brian Mason (a/k/a "Smurf") traveled from Norfolk to defendant Hoffler-Riddick's home in Rockville.  Mason testified that he witnessed Burton hand McBride $30,000 to $40,000 in cash.  McBride immediately handed the cash to defendant Hoffler-Riddick, who took the money upstairs, presumably for safekeeping.

With the arrest of Aaron Burton on May 13, 2004, one of the largest drug rings ever to operate in eastern Virginia began to unravel.  A search of Burton's self storage unit revealed over $2 million in cash.  In an effort to gain leniency, Burton began cooperating with prosecutors and implicated McBride, who was indicted in January 2005 along with 30 other defendants, including Hoffler-Riddick.  To save himself, McBride also began cooperating with prosecutors.  It thus came to pass that the man

6

who used love to induce defendant Hoffler-Riddick to commit criminal acts became the principal witness against her at trial.

## ANALYSIS

A.   The Money Laundering Counts

Counts 40-43 each arise out of defendant Hoffler-Riddick's insistence that McBride honor their original arrangement and pay off the loan with Chrysler Financial. In response to defendant's directive, McBride obtained $16,650 in cash drug proceeds from Aaron Burton.  On September 27, 2000, McBride deposited $9,000 of the cash into his account at the Virginia Educators Credit Union and then immediately withdrew the funds in the form of a cashier's check.  The next day, on September 28, McBride deposited the remaining cash drug proceeds into his account at the credit union and then withdrew $7,629.74 in the form of a cashier's check.  The two cashier's checks were then sent to Chrysler Financial to pay off the loan.

Count 40 charges that defendant Hoffler-Riddick caused McBride to launder $9,000 of illegal drug proceeds when he deposited that sum into his account at the credit union on September 27.  Count 41 charges that defendant Hoffler-Riddick caused McBride to launder the same $9,000 when he immediately withdrew it from his account in the form of a cashier's check.  Similarly, Count 42 charges that defendant Hoffler-Riddick caused McBride to launder $7,650 in illegal drug proceeds when he deposited that sum into his account at the credit union on September 28.  Count 43 charges that defendant Hoffler-Riddick caused McBride to launder $7,629.74 when he immediately withdrew that sum via a cashier's check.  Defendant Hoffler-Riddick is alleged to have "caused" these acts of money laundering by directing McBride in

7

September 2000 to pay the van loan in full.

Money laundering is prohibited by 18 U.S.C. § 1956.  To obtain a conviction

under 18 U.S.C. § 1956(a)(1), the United States must prove each of the following

elements beyond a reasonable doubt:

1.    the defendant conducted or attempted to conduct a financial
      transaction;

2.    the property involved in the financial transaction was the proceeds
      of specified unlawful activity;

3.    the defendant knew that the property involved represented the proceeds
      of some form of unlawful activity; and,

4.    the defendant engaged in the financial transaction:

      (a)    with the intent to promote the carrying on of specified unlawful
             activity; or

      (b)    while knowing that the transaction was designed in whole or
             in part, to conceal or disguise the nature, the location, the
             source, the ownership, or the control of the proceeds of the
             unlawful activity.

See 18 U.S.C. § 1956(a)(1); United States v. Heaps, 39 F.3d 479, 483 (4th Cir. 1994);

United States v. Garcia-Emanuel, 14 F.3d 1469, 1473 (10th Cir. 1994).[1]  With respect

to the fourth element of money laundering, the United States proceeds in this case

solely on a concealment theory.[2]  (2/23/06 Tr. at 19).  This is also known as the "design

_____

[1]The money laundering statute prohibits attempts to conduct concealing
transactions as well as the completion of such transactions.  United States v. McLamb,
985 F.2d 1284, 1292 (4th Cir. 1993).

[2]The Fourth Circuit has explained the distinction between promotion money
laundering and concealment money laundering:

The offense of promotion money laundering stands in contrast to the
offense of "concealment money laundering," as defined and prohibited by

requirement." <u>Garcia-Emanuel</u>, 14 F.3d at 1473.

1. <u>Knowledge that the cash represented drug proceeds</u>

Defendant asserts that the evidence was insufficient to prove beyond a reasonable doubt the third element of money laundering, <u>i.e.</u>, that she knew the funds McBride deposited into and then withdrew from the credit union represented the proceeds of some form of unlawful activity.  Defendant's argument can be distilled to one salient point – she directed only that the loan be paid off per her original agreement with McBride.  She did not specify the source of the funds or even know about the credit union transactions on which counts 40-43 are based.  Defendant correctly asserts that in order to be convicted, she must have "actual subjective knowledge" that the funds were tainted.  <u>Heaps</u>, 39 F.3d at 484; <u>United States v. Campbell</u>, 977 F.2d 854, 857 (4th Cir. 1992); <u>see</u> <u>United States v. Collins</u>, 372 F.3d 629, 634 (4th Cir. 2004); <u>United States v. Lieberman</u>, No. 96-4118, 1997 U.S. App. LEXIS 1057, at *3 (4th Cir. Jan. 24, 1997) (unpublished).  She cannot be convicted for what she objectively should have known.  <u>Heaps</u>, 39 F.3d at 484; <u>Campbell</u>, 977 F.2d at 857.

McBride testified that by the time Burton paid off the van loan, he had informed defendant Hoffler-Riddick of Burton's current drug dealing.  Defendant also knew that Burton was the beneficial owner of the van, and that he provided the money to pay

───────────────

§ 1956(a)(1)(B)(i).  While both offenses require the prosecution to trace the funds at issue to a specified unlawful activity, a defendant commits promotion money laundering by transferring the funds "to promote the carrying on of specified unlawful activity," <u>see</u> § 1956(a)(1)(A)(i), whereas concealment money laundering is committed by transferring such funds "to conceal or disguise" their illegal origins, <u>see</u> § 1956(a)(1)(B)(i).

<u>United States v. Alerre</u>, 430 F.3d 681, 693 n.14 (4th Cir. 2005).

Chrysler Financial each month.  Based on these facts it took no great leap to conclude that Burton would use dirty money to pay off the van loan.

If defendant Hoffler Riddick did not know that Burton's drug cash was used to pay off the van loan, it was only because she remained willfully blind to that fact. Relying on the following instruction,[3] the jury was entitled to construe her willful blindness as actual, subjective knowledge:

> As previously stated in Instruction No. 35, the government must prove beyond a reasonable doubt that (i) the defendants knew that the cash involved in the alleged laundering transaction resulted from illegal activity; and (ii) the defendants knew that the purpose of the transaction was to conceal the illegal proceeds.  The defendants deny having the requisite knowledge.

> The touchstone of knowledge is the defendant's actual subjective knowledge.  A defendant cannot be convicted on what he or she objectively should have known.

> However, you may find that a particular defendant acted knowingly if you find beyond a reasonable doubt that he or she was subjectively aware of a high probability that the funds were illegal or that the purpose of the transaction was to conceal and that he or she deliberately avoided learning the truth.  The essential element of knowledge thus may be inferred from proof that a defendant deliberately closed his or her eyes to what otherwise would have been obvious to that defendant.

> You may not find that the defendant acted knowingly if he or she actually believed the funds to be legitimate or believed the transactions to

_____

[3]The willful blindness instruction is also referred to as an "ostrich instruction," see United States v. Cassidy, 48 Fed. Appx. 428, 443 (4th Cir. 2002) (unpublished); United States v. Forbes, 64 F.3d 928, 934 (4th Cir. 1995), or as a "Jewell instruction" after the Ninth Circuit's opinion in United States v. Jewell, 532 F.2d 697 (9th Cir. 1976), see United States v. Ruhe, 191 F.3d 376, 384 (4th Cir. 1999); United States v. Ebert, No. 96-4871, 1999 U.S. App. LEXIS 8453, at *34 (4th Cir. May 3, 1999) (unpublished).  A "Jewell instruction" combines the principles established by the Jewell majority's opinion with those asserted in the Jewell dissent, which was authored by then Judge, now Justice, Anthony M. Kennedy.  Ebert, 1999 U.S. App. LEXIS 8453, at *34 n.7; see United States v. One 1973 Rolls Royce, 43 F.3d 794, 808 n.11 (3d Cir. 1994).

be for a legitimate purpose.  <u>The requisite knowledge is not present if the defendant acted out of mistake, negligence, or carelessness</u>.

(Instruction No. 36) (emphasis added).  The following cases served as authority for the instruction:  <u>United States v. Guay</u>, 108 F.3d 545, 551 (4th Cir. 1997); <u>United States v. Abbas</u>, 74 F.3d 506, 513 (4th Cir. 1996); <u>United States v. Mancuso</u>, 42 F.3d 836, 846 (4th Cir. 1994); <u>United States v. Whittington</u>, 26 F.3d 456, 462 (4th Cir. 1994); and <u>United States v. Campbell</u>, 977 F.2d 854 (4th Cir. 1992).

It is often said that the willful blindness instruction should be used sparingly.[4] <u>United States v. Ruhe</u>, 191 F.3d 376, 385 (4th Cir. 1999); <u>see</u> <u>United States v. Nicholson</u>, No. 04-04794, 2006 U.S. App. LEXIS 9690, at *16 (4th Cir. Apr. 18, 2006) (unpublished); <u>United States v. Ebert</u>, No. 96-4871, 1999 U.S. App. LEXIS 8453, at *37 (4th Cir. May 3, 1999) (unpublished); <u>see</u> <u>also</u> <u>United States v. Alston-Graves</u>, 435 F.3d 331, 340-41 (D.C. Cir. 2006); <u>United States v. Heredia</u>, 429 F.3d 820, 824 (9th Cir. 2005); <u>United States v. Concha</u>, 233 F.3d 1249, 1252 (10th Cir. 2000); <u>United States v. Faulkner</u>, 17 F.3d 745, 766 (5th Cir. 1994).  Judge Michael of the Fourth Circuit has eloquently explained the particular danger that this instruction poses in a concealment money laundering case:

> Spending money is legal.  Laundering money by concealing is not.  The line between these two categories of commercial transactions is sometimes blurry.  That line can become even blurrier in a money laundering prosecution when the government obtains the (rarely used)

---

[4]Although such instructions should be used sparingly, "in the federal courts, willful blindness instructions . . . are now commonly given and commonly upheld." <u>United States v. Alston-Graves</u>, 435 F.3d 331, 338 (D.C. Cir. 2006).  Indeed, the Fourth Circuit has "repeatedly upheld the use of such an instruction," and has "done so specifically in the money laundering context."  <u>United States v. Nicholson</u>, No. 04-4794, 2006 U.S. App. LEXIS 9690, at *16 (4th Cir. Apr. 18, 2006) (unpublished).

willful blindness instruction.  A jury following the instruction may infer from circumstantial evidence the defendant's deliberate ignorance of the transaction's criminal aspect, which in turn allows the jury to infer guilty knowledge.  The potentially slippery combination of the willful blindness instruction and a concealment money laundering charge cannot be permitted to eviscerate the defendant's right to be convicted only upon proof beyond a reasonable doubt.  Thus, when the government considers requesting a willful blindness instruction, it (and the district court if the request is made) must be especially careful in examining the evidence that might support such an instruction.

Nicholson, 2006 U.S. App. LEXIS 9690, at *22-23 (Michael, J., concurring).

Relying on case law from the Ninth Circuit, see, e.g., United States v. Sanchez-Robles, 927 F.2d 1070, 1074 (9th Cir. 1991), defendant asserted in oral argument that a willful blindness instruction is impermissible where, as here, the United States has prosecuted its case on the theory of actual knowledge and introduced evidence to that effect at trial.  Defendant's argument is unavailing because the Fourth Circuit repeatedly has held that a willful blindness instruction is appropriate even "when there is evidence of both actual knowledge and deliberate ignorance."  United States v. Schnabel, 939 F.2d 197, 204 (4th Cir. 1991); see also United States v. Hatcher, 132 Fed. Appx. 468, 475 (4th Cir. 2005) (unpublished); Ruhe, 191 F.3d at 384; Mancuso, 42 F.3d at 846; Abbas, 74 F.3d at 513.

Defendant also asserted that there was no evidentiary foundation for the willful blindness instruction because the United States failed to prove that defendant Hoffler-Riddick's lack of inquiry resulted from a desire to remain ignorant of the funds' sources and uses.  See Lieberman, 1997 U.S. App. LEXIS 1057, at *5 (reversing money laundering conviction where evidence did not support willful blindness instruction and holding that "concluding knowledge from merely not asking is outright speculation").

12

Unlike defendants in some other reported cases, defendant Hoffler-Riddick did not expressly decline to investigate further, see, e.g., United States v. Jewell, 532 F.2d 697, 699 n.2 (9th Cir. 1976), but that is not required for the Court to give the willful blindness instruction.  The Court need only conclude that "the evidence supports an inference of deliberate ignorance."  Abbas, 74 F.3d at 513 (quoting United States v. Gruenberg, 989 F.2d 971, 974 (8th Cir. 1993)) (emphasis added); see also Nicholson, 2006 U.S. App. LEXIS 9690, at *16; United States v. Filcheck, 165 Fed. Appx. 284, 287 (4th Cir. 2006) (unpublished); Ruhe, 191 F.3d at 384; Guay, 108 F.3d at 551; Whittington, 26 F.3d at 463.

The evidence in this case was more than ample to satisfy the inference standard.  It strains credulity to believe that defendant Hoffler-Riddick did not perceive a "high probability" of criminal activity[5] when at her request a known money launderer (McBride) paid off the loan for a van owned by a known drug dealer (Burton).

While district courts must assess rigorously the appropriateness of a willful blindness instruction, the Fourth Circuit repeatedly has upheld the instruction's use, even in money laundering cases.  Nicholson, 2006 U.S. App. LEXIS 9690, at *16; see Hatcher, 132 Fed. Appx. at 475; United States v. McLean, 131 Fed. Appx. 34, 38-39 (4th Cir. 2005) (unpublished); United States v. Collins, 372 F.3d 629, 634 (4th Cir.

---

[5]The willful blindness instruction given at trial required the jury to find that defendant Hoffler-Riddick "was subjectively aware of a high probability that the funds were illegal or that the purpose of the transaction was to conceal."  (Instruction No. 36) (emphasis added).  This may have overstated (in defendant's favor) the necessary awareness of criminal activity.  The Fourth Circuit has approved jury instructions that required only a "strong suspicion" of criminal activity.  See, e.g., Nicholson, 2006 U.S. App. LEXIS 9690, at *15-16; United States v. Bivins, 104 Fed. Appx. 892, 897-98 (4th Cir. 2004) (unpublished).

2004); United States v. Cassidy, 48 Fed. Appx. 428, 443-44 (4th Cir. 2002)

(unpublished); United States v. Matai, No. 97-4129, 1999 U.S. App. LEXIS 1976, at *6-

9 (Feb. 10, 1999) (unpublished); Whittington, 26 F.3d at 462-63.  Moreover, even if the

facts of this case presented a closer question, the Fourth Circuit will reverse a jury

instruction only when the instructions as a whole constitute an abuse of discretion.  See

Abbas, 74 F.3d at 513 (stating principle that district court decision whether to give jury

instruction and content of jury instruction are reviewed for abuse of discretion); see also

United States v. Ellis, 121 F.3d 908, 923 (4th Cir. 1997) (same); United States v.

Russell, 971 F.2d 1098, 1107 (4th Cir. 1992) (same).  Further, even when "use or

denial of a jury instruction is in error, reversal is warranted only when the error is

prejudicial based on a review of the record as a whole."  Ellis, 121 F.3d at 923; see also

United States v. Higgs, 353 F.3d 281, 309 (4th Cir. 2003).

     2. Concealment of the origin or ownership of the funds

     Defendant asserts that the United States also failed to prove the fourth element

of money laundering, i.e., that the payoff of the van loan was designed to disguise or

conceal the source, ownership, or control of the cash drug proceeds.  Not surprisingly,

the United States does not contend that the financial transaction itself accomplished the

necessary concealment.  Paying off the loan balance in one lump sum of $16,629.74,

rather than in monthly installments of $473.32, did not make it more likely that Burton's

involvement would remain hidden.  If anything, substituting the payment of one lump

sum for a number of small payments over time had the opposite effect.  Cf. United

States v. Villarini, 238 F.3d 530, 533 (4th Cir. 2001) (explaining that breaking large sum

of money into smaller transactions "gives rise to a reasonable inference that the

transactions were designed to avoid suspicion or to give the appearance that [defendant] had a legitimate cash income stream").

The United States instead contends that the concealment occurred when the defendant failed to take the van out of her name and put it into Burton's name once Chrysler Financial released its lien. The following colloquy outlines the government's theory:

> THE COURT: Let me ask you this: The fourth element about the transaction being designed to disguise, how does paying off the loan advance disguising of the transaction?
>
> MR. HURT: It doesn't. What advances the disguising -- and <u>we've not argued that paying off the loan is the actual disguising.</u>
>
> THE COURT: It's not a disguising act –
>
> MR. HURT: That's right.
>
> THE COURT: -- in and of itself?
>
> MR. HURT: <u>The disguising is the van, keeping the van in her name and for five months afterwards.</u> I think it would be a more difficult argument for the government if Aaron Burton had paid off that van and put it immediately in his name. I think the government would be very hard-pressed to argue that that is a continuation of the disguising. But that's not what happened. The defendant, even though the van was paid off and could have been transferred to Aaron Burton at that time or at any point before then, <u>she continued to have that van in her name for another five months concealing -- clearly at that point concealing the actual owner because there is no more financing in her name.</u> I mean, it is clearly not a van to which she has any connection at that point at all.

(2/23/06 Tr. at 37-38) (emphasis added).

The text of the money laundering statute requires that the defendant engage in a financial transaction while knowing that <u>the transaction</u> was designed "to conceal or disguise." 18 U.S.C. § 1956(a)(1)(B)(i). The United States' theory disregards the

purpose of the transaction itself and instead focuses on what the defendant could have done, but failed to do, once the transaction was completed. To expand the money laundering statute beyond acts of commission to include subsequent omissions would do violence to Congress' intent to criminalize only certain financial transactions.

The <u>sine qua non</u> of concealment money laundering is a specific intent to conceal. <u>See</u> <u>Villarni</u>, 238 F.3d at 533; <u>United States. v. Gilliam</u>, 975 F.2d 1050, 1056 (4th Cir. 1992); <u>see</u> <u>also</u> <u>Garcia-Emanuel</u>, 14 F.3d at 1474; <u>United States v. Sanders</u>, 929 F.2d 1466, 1472 (10th Cir. 1991). This "requires more than a trivial motivation to conceal." <u>Garcia-Emanuel</u>, 14 F.3d at 1474; <u>see</u> <u>also</u> <u>United States v. McGahee</u>, 257 F.3d 520, 528 (6th Cir. 2001). There was simply no evidence that defendant Hoffler-Riddick initiated the loan payoff transaction for the purpose or design of concealing assets. <u>See</u> <u>Heaps</u>, 39 F.3d at 487 (ruling that money laundering does not occur when funds were wired merely for convenience rather than concealment); <u>Garcia-Emanuel</u>, 14 F.3d at 1474 ("[T]he government must prove that the specific transactions in question were designed, at least in part, to launder money, not that the transactions involved money that was previously laundered through other means.").

B.      The Conspiracy Count

Count 4 of the Indictment charges that defendant Hoffler-Riddick and numerous other individuals (including McBride and Burton) conspired to launder money in violation of 18 U.S.C. § 1956(h). This count is both factually and legally broader than the credit union transactions targeted in Counts 40-43. Factually, the proof that supports Count 4 includes the $10,000 in cashier's checks purchased by Patrice Jones, the $20,000 defendant Hoffler-Riddick converted into a cashier's check and 26 money orders, and

16

the stack of cash that Burton gave to McBride at defendant's residence in Rockville.

Legally, the government was not required to prove that defendant Hoffler-Riddick

actually had committed concealment money laundering in order to convict her of

conspiring to do so.  See Alerre, 430 F.3d at 694.  The United States does not need to

prove an overt act to secure a conspiracy conviction under 18 U.S.C. § 1956(h).

Whitfield v. United States, 543 U.S. 209, 214-16 (2005); United States v. Bolden, 325

F.3d 471, 491 (4th Cir. 2003); United States v. Godwin, 272 F.3d 659, 669 n.9 (4th Cir.

2001).

Defendant asserts that the evidence was insufficient to convict her of the

conspiracy charged in Count 4 because the United States' evidence rested solely on

the testimony of John McBride, and he is not credible as a matter of law.  While

McBride is certainly an unchivalrous charlatan, that does not automatically make

defendant Hoffler-Riddick an innocent damsel in distress.  Nor is it a defense that she

laundered drug money out of love rather than for pecuniary gain.  See United States v.

Isabel, 945 F.2d 1193, 1203 (1st Cir. 1991).[6]  Even individuals on a "mission from God"

still must obey the law.[7]

A court cannot weigh the credibility of witnesses when deciding a Rule 29 Motion

for Judgment of Acquittal.  See United States v. Uzenski, 434 F.3d 690, 700 (4th Cir.

2006); Alerre, 430 F.3d at 693; Campbell, 977 F.2d at 859.  The evidence must be

---

[6]While defendant Hoffler-Riddick ultimately received a financial benefit for
assisting McBride, see supra at p. 5, this was an after-the-fact lagniappe rather than a
contemporaneous quid pro quo.

[7]With apologies to Elwood and Jake (R.I.P.), The Blues Brothers (Universal
Studios 1980).

viewed in "the light most favorable to the government to determine whether the jury's verdict was supported by substantial evidence."  United States v. Strickland, 245 F.3d 368, 385 (4th Cir. 2001); see also United States v. Smith, 451 F.3d 209, 216 (4th Cir. 2006); Alerre, 430 F.3d at 693.  The Fourth Circuit defines "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  Smith, 451 F.3d at 216 (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996)).  "It is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt."  United States v. Beddow, 957 F.2d 1330, 1334 (6th Cir. 1992).

Defendant cites no case that allows a court to disregard entirely the testimony of a witness because other witnesses disagreed with his recollection of some events.  The jury was instructed that it could "believe all of that witnesses' testimony, only a portion of it, or none of it."  (Instruction No. 11).  As it was empowered to do, the jury decided to believe McBride's testimony on the essential elements of the conspiracy offense.  A jury's "[c]redibility determinations are given great weight and will not be disturbed." United States v. Kaufmann, 985 F.2d 884, 893 (7th Cir. 1993); see also Smith, 209 F.3d at 216-17.

When viewed in the light most favorable to the United States, there is no doubt that the evidence introduced at trial was sufficient to convict defendant.  McBride testified that he told defendant Hoffler-Riddick that he was laundering Burton's drug cash and described in detail the transactions in which he and defendant engaged.  Moreover, his testimony was corroborated in substantial part by documentary evidence. For example, the United States introduced a number of documents pertaining to the

18

purchase of the 1998 Chrysler Town and Country van using Burton's $8,000 in cash for the down payment.  McBride's Crestar Bank statement indicates that on February 20, 1998, $8,000 was deposited into McBride's account, and on the very same day, $8,000 was withdrawn from the account via personal check.  (Gov. Ex. 272).  The government presented a check for $8,000 made payable to "cash" drawn from McBride's personal account dated February 20, 1998, as well as a cashier's check from Crestar Financial Corporation made payable to "Pomoco Chrysler Plymouth" in the amount of $8,000, which also bore the same date.  (Gov. Ex. 273).  "Pamela Hoffler-Riddick" is listed as the purchaser on the face of the cashier's check.  (Gov. Ex. 273).  A cashier's check, dated February 25, 1998, from Crestar Financial Corporation in the amount of $700 was made payable to an insurance company for the cost of insuring the van for one year.  (Gov. Ex. 363; Trial Tr. at 26-27).  Although McBride purchased the cashier's check, the check lists "Pamela Hoffler-Riddick" as the purchaser.  (Gov. Ex. 363; Trial Tr. at 27).  Monthly statements for McBride's personal brokerage account from September 1999 through September 2000 indicate that McBride wrote checks to Chrysler Financial Corporation, on an almost monthly basis, in the amount of $473.32 toward the payment of the vehicle loan.  (Gov. Ex. 277-87; Trial Tr. at 31-32).

Documentary evidence also corroborates McBride's testimony concerning the payoff of the vehicle loan.  In addition to copies of the deposits and checks discussed supra at p. 4, 7-8, the United States introduced a September 28, 2000 memorandum that McBride drafted and sent to Chrysler Financial Corporation in an envelope that also contained the cashier's checks.  (Gov. Ex. 295; Trial Tr. at 37).  In the memorandum, McBride states that the two cashier's checks were intended to effect "the full payoff of

the loan."  (Gov. Ex. 295; Trial Tr. at 37).

The United States also presented evidence to corroborate McBride's testimony that he gave defendant Hoffler-Riddick $10,000 of Burton's cash to convert into cashier's checks towards the purchase of the Center Street property.  Two cashier's checks from NationsBank, each in the amount of $5,000 and dated May 20, 1999, were made payable to a title company.  (Gov. Ex. 410, 412).  Handwritten notations in the endorsement area on the back of these checks purport that the checks were "not used for purpose intended."  (Gov. Ex. 410, 412).  Further handwritten notations indicate that "Patrice Jones" used the checks to purchase two other cashier's checks.  (Gov. Ex. 410, 412).  There were also two additional cashier's checks from NationsBank, each in the amount of $5,000 and dated May 24, 1999, that were made payable to the attorney closing the transaction.  (Gov. Ex. 309, 409, 411).  These checks support McBride's testimony that he instructed defendant Hoffler-Riddick to exchange the checks that erroneously had been made payable to the title company for checks made payable to the closing attorney.

Documentary evidence also supports McBride's assertion that he gave defendant Hoffler-Riddick $20,000 of Burton's cash to convert into a cashier's check and money orders for use in the purchase of the Pembroke Avenue property.  A cashier's check from defendant Hoffler-Riddick's MCT Credit Union account in Rockville, Maryland, in the amount of $7,000 and dated November 9, 2000, was made payable to the business checking account of one of McBride's front companies, which he established with a co-defendant and a co-conspirator.  (Gov. Ex. 325; Trial Tr. at 58-59, 61-62).  In addition, the government presented copies of the twenty-six $500

Western Union money orders, totaling $13,000, which were made payable to the same front company as the $7,000 cashier's check.  (Gov. Ex. 326-51; Trial Tr. at 63-66). The serial numbers on the money orders established that they were purchased in Rockville, Maryland.

Finally, the United States presented evidence corroborating McBride's claim that he paid off two loans totaling $6,560 that defendant Hoffler-Riddick owed to the Norfolk Schools Federal Credit Union as a reward to defendant for her help in purchasing the van for Burton.  (Trial Tr. at 54-55).  Receipts from the credit union indicate that the outstanding balances on two loans owed by defendant Hoffler-Riddick, in the amounts of $3,146.95 and $3,413.05, were paid in full on May 31, 2000.  (Gov. Ex. 317).

The proof of defendant's involvement in a money laundering conspiracy did not rest solely on McBride's testimony and the corroborating documentary evidence. Patrice Jones testified that defendant gave her $10,000 in cash and asked her to purchase cashier's checks to be used in a house closing.  When the initial checks were made out to the wrong party, Ms. Jones testified that she purchased replacement checks at defendant's request.  While defendant denied any involvement in these transactions, receipts signed by defendant place her and Ms. Jones together on the date and at the approximate time of the check purchases.

Third party testimony also came from Brian Mason a/k/a "Smurf."  Mr. Mason testified that he rode with Aaron Burton from Norfolk, Virginia to defendant's home in Rockville, Maryland.  While sitting in the den of defendant's house, he observed Burton give McBride "two stacks" of cash, totaling approximately $30,000 to $40,000.  Mason further testified that McBride then handed the two stacks of cash to defendant Hoffler-

21

Riddick, who immediately carried the cash upstairs.

C.      Calculation of Defendant's Guideline Range

_____In calculating the defendant's advisory guideline sentence, the Court began with

U.S.S.G. § 2S1.1.  That section states, in pertinent part:

> **Laundering of Monetary Instruments; Engaging in Monetary**
> **Transactions in Property Derived from Unlawful Activity**
>
> (a)      Base Offense Level:
>
> > (1)      The offense level for the underlying offense from which the
> > laundered funds were derived, if (A) the defendant
> > committed the underlying offense <u>(or would be accountable</u>
> > <u>for the</u> underlying offense under subsection (a)(1)(A) of §
> > <u>1B1.3</u> <u>(Relevant Conduct))</u>; and (B) the offense level for that
> > offense can be determined; or
> >
> > (2)      **8** plus the number of offense levels from the table in § 2B1.1
> > (Theft, Property Destruction, and Fraud) corresponding to
> > the value of the laundered funds, otherwise.

U.S.S.G. § 2S1.1(a) (emphasis added).  U.S.S.G. § 1B1.3 (Relevant Conduct), which is

referenced above, provides:

> **Relevant Conduct (Factors that Determine the Guideline Range)**
>
> (a)      <u>Chapters Two (Offense Conduct) and Three (Adjustments)</u>.  Unless
> otherwise specified, (i) the base offense level where the guideline
> specifies more than one base offense level, (ii) specific offense
> characteristics and (iii) cross references in Chapter Two, and (iv)
> adjustments in Chapter Three, shall be determined on the basis of
> the following:
>
> > (1)      (A)      all acts and omissions committed, aided, abetted,
> > counseled, commanded, induced, procured, or
> > willfully caused <u>by the defendant</u>; and
> >
> > (B)      <u>in the case of a jointly undertaken criminal activity</u> (a
> > criminal plan, scheme, endeavor, or enterprise
> > undertaken by the defendant in concert with others,

22

> whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3(a)(1) (emphasis added).  Even though there was no credible evidence that defendant Hoffler-Riddick ever distributed drugs,[8] the United States sought to attribute 6 kilograms of cocaine to her pursuant to § 2S1.1(a)(1).  The government argued that drug distribution should be part of defendant Hoffler-Riddick's "relevant conduct" because she was convicted of conspiring with McBride and Burton, both of whom sold drugs.  The defense objected to this proposed application of the guidelines and instead urged the Court to calculate Hoffler-Riddick's sentence under § 2S1.1(a)(2), which considers only the amount of money she laundered.

The Court sustained the defendant's objection.  In order to convert laundered money into drugs for purposes of calculating an offense level, the defendant must be accountable for the underlying offense (i.e., drug dealing) through application of the relevant conduct test set forth in § 1B1.3(a)(1)(A).[9]  See U.S.S.G. § 2S1.1(a)(1); see

---

[8]John McBride testified that defendant Hoffler-Riddick rode with him once when he delivered three kilograms of cocaine to Aaron Burton and that she examined the cocaine out of curiosity.  The United States produced no evidence to corroborate this story.  Because the Court had substantial questions concerning McBride's veracity, it was unwilling to rely solely on McBride's word and ruled that the United States had not proven the event by a preponderance of the evidence.

[9]Relevant conduct is considered the "cornerstone" of the Sentencing Guidelines.  See William W. Wilkins, Jr. & John R. Steer, Relevant Conduct:  The Cornerstone of the Federal Sentencing Guidelines, 41 S.C. L. Rev. 495, 496 (1990); see also United States v. Cianci, 154 F.3d 106, 113 (3d Cir. 1998); United States v. Ritsema, 31 F.3d

also United States v. Glass, No. 05-1328, 2006 U.S. App. LEXIS 19012, at *10 (10th

Cir. July 26, 2006) (unpublished); United States v. Charon, 442 F.3d 881, 887 (5th Cir.

2006); United States v. Caro-Muniz, 406 F.3d 22, 30-31 (1st Cir. 2005).  That section

requires that the defendant have "committed, aided, abetted, counseled, commanded,

induced, procured, or willfully caused" the drug dealing.  U.S.S.G. § 1B1.3(a)(1)(A); see

also United States v. Fullilove, 388 F.3d 104, 106-07 (4th Cir. 2004).  Application Note

2(B) to § 2S1.1 provides:

> In order for subsection (a)(1) to apply, the defendant must have
> committed the underlying offense or be accountable for the underlying
> offense under § 1B1.3(a)(1)(A).  The fact that the defendant was involved
> in laundering criminally derived funds after the commission of the
> underlying offense, without additional involvement in the underlying
> offense, does not establish that the defendant committed, aided, abetted,
> counseled, commanded, induced, procured, or willfully caused the
> underlying offense.

U.S.S.G. § 2S1.1, cmt. n.2(B); see also United States v. Tedder, 403 F.3d 836, 842-43

(7th Cir. 2005).  As stated above, there was no credible evidence that defendant

Hoffler-Riddick did anything other than assist in concealing money that had become

tainted long before it got to her.

That defendant Hoffler-Riddick was convicted of conspiring with drug dealers to

launder money does not alter this conclusion.  In order to convert laundered money into

drugs for purposes of calculating an offense level, the Court considers only the actions

undertaken by the defendant herself.  Contrary to the United States' contention, the

Court cannot convert money into drugs based on the acts of individuals other than the

---

559, 564 (7th Cir. 1994); United States v. Carreon, 11 F.3d 1225, 1232 (5th Cir. 1994);
United States v. Galloway, 976 F.2d 414, 419 (8th Cir. 1992).

defendant.  Section 2S1.1(a)(1) cross-references only subsection(a)(1)(A) of the

relevant conduct guidelines; it specifically does not cross-reference subsection

(a)(1)(B), which makes a defendant accountable for all reasonably foreseeable acts of

her co-conspirators.  See U.S.S.G. §§ 1B1.3(a)(1) & 2S1.1(a)(1).  If the Sentencing

Commission had intended to mandate the conversion of drugs into money based on co-

conspirator conduct, it would have expanded § 2S1.1(a)(1) to include relevant conduct

calculated under subsection (a)(1)(B) of § 1B1.3.  This interpretation of the statute is

supported by the well established statutory construction maxim "inclusio unius est

exclusio alterius," the inclusion of the one implies the exclusion of the other.  See

United States v. Koonce, 991 F.2d 693, 698 (11th Cir. 1993); see also United States v.

Polanco, 451 F.3d 308, 310 (3d Cir. 2006); United States v. Tappin, 205 F.3d 536, 540

(2d Cir. 2000); United States v. Terrence, 132 F.3d 1291, 1294 (9th Cir. 1997); United

States v. McQuilkin, 78 F.3d 105, 108 (3d Cir. 1996).

Having concluded that § 2S1.1(a)(2) was the applicable guideline under which to

begin calculating defendant Hoffler-Riddick's offense level, the Court next considered

the amount of money laundered.  In doing so, the Court used the Loss Table set forth in

§ 2B1.1.  The Court found that defendant Hoffler-Riddick had laundered directly

$36,560 in drug money.  The Court further attributed the defendant with an additional

$209,900, which represented the sales prices of the two houses that defendant helped

Burton purchase with laundered funds.  The inclusion of this additional sum was

mandated by Application Note 3(A) to § 2B1.1.  The Note states that the "amount of

loss" used in the Table shall be the "greater of actual loss or intended loss."  U.S.S.G. §

2B1.1, cmt. n.3(A); see United States v. Adair, No. 05-4377, 2006 U.S. App. LEXIS

25

14729, at *3 (4th Cir. June 15, 2006) (unpublished); see also United States v. Scott, 448 F.3d 1040, 1044 (8th Cir. 2006); United States v. Geeslin, 447 F.3d 408, 410 (5th Cir. 2006); United States v. Tupone, 442 F.3d 145, 153 (3d Cir. 2006).  The term "intended loss" is defined expansively to include "the pecuniary harm that was intended to result from the offense."  U.S.S.G. § 2B1.1, cmt. n.3(A)(ii)(I); see Adair, 2006 U.S. App. LEXIS 14729, at *3; United States v. Miller, 316 F.3d 495, 503 (4th Cir. 2003); see also United States v. Sliman, 449 F.3d 797, 801 (7th Cir. 2006); United States v. Alli, 444 F.3d 34, 38 (1st Cir. 2006).  If successful, the schemes in which defendant Hoffler-Riddick participated would have allowed Aaron Burton to convert the full purchase prices of the houses from cash into real estate that was titled in someone else's name.

The total amount of loss calculated by the Court, $246,460, when combined with certain appropriate enhancements, produced an Offense Level of 28.  After measuring this Offense Level against defendant's Category 1 criminal history, the guidelines recommended a custody range of 78 to 97 months.  Upon considering the factors set forth in 18 U.S.C. § 3553(a), the Court found that the statute was best served by a guideline sentence and ordered that the defendant be incarcerated for a term of imprisonment at the low end of the guidelines.

D.    Appeal Bond

Finally, defendant Hoffler-Riddick moved the Court to remain free on bond pending the appeal of her conviction and sentence.  Such motions are governed by 18 U.S.C. § 3143(b)(1), which provides in pertinent part:

> [T]he judicial officer shall order that a person who has been found guilty of
> an offense and sentenced to a term of imprisonment, and who has filed
> an appeal or a petition for a writ of certiorari, be detained, unless the

judicial officer finds –

(A)     by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B)     that the appeal is not for the purpose of delay and raises a substantial question of law or fact <u>likely to result in</u> –

    (i)     reversal,
    (ii)    an order for a new trial,
    (iii)   a sentence that does not include a term of imprisonment, or
    (iv)   a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title.

<u>Id.</u> (emphasis added).

The United States does not contend that defendant Hoffler-Riddick is a flight risk or that she poses a danger to the community.  Defendant does not contend that any reduction in her sentence on appeal is likely to result in no incarceration or less incarceration than the time that will elapse during the pendency of the appeal.  The parties therefore appropriately focused their arguments on the question whether defendant's appeal of her conviction is "likely to result" in a reversal or a new trial.

Defendant Hoffler-Riddick asserted both in her Supplemental Motion for Appeal Bond (Docket No. 801), and in oral argument on July 17, 2006, that her principal[10] argument on appeal will involve the willful blindness instruction discussed <u>supra</u> at p.

---

[10]Defendant also asserts that the evidence was insufficient to convict her of conspiracy to launder money.  The overwhelming evidence of defendant's knowing participation in the conspiracy is discussed <u>supra</u> at p. 16-22.

27

10-14.  However, this instruction related solely to the substantive money laundering counts that the Court dismissed pursuant to Fed. R. Civ. P. 29(c).  Count 4, the conspiracy count that the Court upheld, was unaffected by the willful blindness instruction.  Because the likelihood of success on appeal standard codified in 18 U.S.C. § 3143(b)(1) was not met, the Court denied defendant's Motion for an Appeal Bond.

The Clerk is **DIRECTED** to send a copy of this Opinion to defendant and to all counsel of record.

**IT IS SO ORDERED**.

_____/s/_____
Walter D. Kelley, Jr.
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 16, 2006